# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF NEW YORK

JULIE A.,

                                        Plaintiff,

          v.

                                                        8:20-CV-1237
COMMISSIONER OF SOCIAL                                  (ATB)
SECURITY,

                                        Defendant.

VICTORIA H. COLLINS, ESQ., , for Plaintiff
NATASHA OELTJEN, Special Asst. U.S. Attorney, for Defendant

ANDREW T. BAXTER
United States Magistrate Judge

## MEMORANDUM-DECISION AND ORDER

This matter was referred to me, for all proceedings and entry of a final judgment, pursuant to the Social Security Pilot Program, N.D.N.Y. General Order No. 18, and in accordance with 28 U.S.C. § 636(c), Fed. R. Civ. P. 73, N.D.N.Y. Local Rule 73.1, and the consent of the parties. (Dkt. Nos. 3, 4).

## I.    PROCEDURAL HISTORY

On December 8, 2016, plaintiff protectively filed an application for a period of disability and disability insurance benefits ("DIB"), alleging that she became disabled on December 18, 2016. (Administrative Transcript ("T.") 63, 189).  Her application was denied initially on May 26, 2017. (T. 63).  Plaintiff requested a hearing, which was held by video conference on May 14, 2019 before Administrative Law Judge ("ALJ") Michael Shilling. (T. 37-62).  Plaintiff and Vocational Expert ("VE") Janice S. Hasert testified at the hearing. (*Id.*)  ALJ Shilling issued an unfavorable decision on June 4,

2019, which became the Commissioner's final decision when the Appeals Council denied plaintiff's request for review on August 14, 2020. (T. 1-5 (AC Denial), 10-21 (Hearing Decision)).

## II.    GENERALLY APPLICABLE LAW

### A. Disability Standard

To be considered disabled, a plaintiff seeking disability insurance benefits or SSI disability benefits must establish that she is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months . . . ." 42 U.S.C. § 1382c(a)(3)(A). In addition, the plaintiff's

> physical or mental impairment or impairments [must be] of such  severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which [she] lives, or whether a specific job vacancy exists for [her], or whether [she] would be hired if [she] applied for work

42 U.S.C. § 1382(a)(3)(B).  The Commissioner uses a five-step process, set forth in 20 C.F.R. sections 404.1520 and 416.920, to evaluate disability insurance and SSI disability claims.

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If [she] is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits [her] physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which meets or equals the criteria of an impairment listed in Appendix 1 of

2

the regulations. If the claimant has such an impairment, the [Commissioner] will consider [her] disabled without considering vocational factors such as age, education, and work experience … Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, [she] has the residual functional capacity to perform [her] past work. Finally, if the claimant is unable to perform [her] past work, the [Commissioner] then determines whether there is other work which the claimant can perform.

*Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982); *see* 20 C.F.R. §§ 404.1520, 416.920. The plaintiff has the burden of establishing disability at the first four steps. However, if the plaintiff establishes that her impairment prevents her from performing her past work, the burden then shifts to the Commissioner to prove the final step. *Id.*

### B. Scope of Review

In reviewing a final decision of the Commissioner, a court must determine whether the correct legal standards were applied and whether substantial evidence supported the decision. *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013); *Brault v. Soc. Sec. Admin. Comm'r,* 683 F.3d 443, 448 (2d Cir. 2012); 42 U.S.C. § 405(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012). It must be "more than a scintilla" of evidence scattered throughout the administrative record. *Id.* However, this standard is a very deferential standard of review, "even more so than the 'clearly erroneous standard.'" *Brault,* 683 F.3d at 448.

"To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams on behalf of Williams v. Bowen*, 859 F.2d

255, 258 (2d Cir. 1988). However, a reviewing court may not substitute its interpretation of the administrative record for that of the Commissioner, if the record contains substantial support for the ALJ's decision. *Id. See also Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982).

An ALJ is not required to explicitly analyze every piece of conflicting evidence in the record. *See, e.g., Monguer v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983); *Miles v. Harris*, 645 F.2d 122, 124 (2d Cir. 1981) (Finding we are unwilling to require an ALJ explicitly to reconcile every conflicting shred of medical testimony). However, the ALJ cannot "pick and choose evidence in the record that supports his conclusions." *Cruz v. Barnhart*, 343 F. Supp. 2d 218, 224 (S.D.N.Y. 2004); *Fuller v. Astrue*, No. 09-CV-6279, 2010 WL 5072112 (W.D.N.Y. Dec. 6, 2010).

## III.  **FACTS**

Plaintiff was born on April 3, 1961 and was 58 years old at the time of the ALJ hearing. (T. 41).  She completed one year of college, but no other job or vocational training, other than "self-employment." (*Id.*)  Plaintiff was married and lived in a home with her husband and three cats. (*Id.*)  Plaintiff testified that she drove thirty four miles to the hearing, but she started to get severe pinching in her neck that radiated down her left arm and radiated a burning sensation into her chest. (T. 42).

Plaintiff testified that, at the time of the hearing, she owned a retail store which sold and repaired computers and cellular telephones. (T. 42-43, 44).  Plaintiff testified that she went down to the store ten to fifteen hours per week so that she could make enough money to "pay the bills on the building," but she no longer did any of the work

herself. (T. 43).  She hired someone to actually perform the device repair.[1]  (*Id.*)  Plaintiff testified that the store was "going under," and that she was not taking a paycheck or making any money from the business.[2]  (T. 43).

Plaintiff also testified that she obtained her real estate license the year before the hearing and was trying to sell some real estate, but she had trouble showing houses because the driving bothered her.[3]  Plaintiff also attempted to work selling advertising for a radio station, but stated that she was let go because she could not perform the driving required to go from business to business in order to make sales.[4]  (T. 44).  The driving bothered her back.  (*Id.*)

Plaintiff testified that her greatest limitation was sitting because it caused constant pain in her neck.  (T. 45).  Plaintiff testified that she went to physical therapy for her neck pain, and that the therapist put her in "traction," so that the nerve in her shoulder did not get "pinched."  (*Id.*)  The pinched nerve caused her to lose the use of her left arm, but cortisone shots helped somewhat.  (T. 45-46).  Plaintiff also testified that she had trouble using both hands because of the arthritis in her thumbs.  (*Id.*)  At the time of the hearing, she stated that her left side was worse, and that she had been

---

[1] Plaintiff testified that she would be required to lift up to fifty pounds when she was more active in the repair business. (T. 44).

[2] Plaintiff testified that she had owned the business for approximately twenty years. (T. 43). She stated that she obtained a grant to start a business out of her home "because of [her] disability," but four years later, "the village" told her she had to move the business out of her home or shut it down, so she opened up the storefront. (*Id.*)

[3] She testified that she would "occasionally" show a house. (T. 43).

[4] Plaintiff worked in northern New York, and she stated that businesses were often located fifty miles apart, causing her to drive long distances. (T. 44-45).

receiving cortisone shots for her hands, which afforded her relief for approximately one month, at which time, the pain returned, "shooting" up her left thumb and arm. (T. 47). Plaintiff stated that she dropped "everything" because her hands were so arthritic. (*Id.*) She had trouble with fine manipulation, such as putting on a necklace or buttoning her granddaughter's clothes. (*Id.*)  Plaintiff testified that she also had carpal tunnel syndrome ("CTS") on the right side, and she needed surgery on her thumbs, but she had to have surgery on her feet first.[5] (*Id.*)

Plaintiff testified that she wore inserts in both shoes, and that she had to be very careful lifting her left foot because the bone spurs caused her pain. (T. 48).  She had nerve damage in the second toe of her right foot, and if the toe "hit[] the ground," the pain [was] "horrible," and she was unable to walk. (*Id.*)  She needed to elevate her feet every night, but she had a difficult time sitting in her recliner because the pain in her low back radiated down her legs. (*Id.*)  Plaintiff stated that the pain in her legs woke her up every night.[6]  When she drove her car, her muscles tightened up so much she needed to stop on the side of the road, get out of the car, and stretch her legs because she could not "control the muscle from the knee down to the toes." (*Id.*)  Plaintiff stated that she had been to the emergency room several times for "it." (T. 49).

Plaintiff testified that she treats her back pain with heat, goes to physical therapy,

---

[5] Plaintiff stated that she had "about two inches worth of bone spurs on the top of [her] left foot that have to be removed first." (T. 47).  She testified that she had severe arthritis in both feet due to old injuries, including a car accident 37 years ago, and a broken ankle in high school. (T. 47-48).

[6] Later, plaintiff testified that the right leg pain generally woke her up once or twice per week, but the week before the hearing, she woke up with pain every night. (T. 49).  The pain in her back "doesn't ever go away." (*Id.*)

6

and sees a chiropractor. (T. 49).  She stated that when she had her car accident thirty seven years ago, she was thrown from the car, and "went down the road 50 yards on [her] right side." (*Id.*)  Plaintiff testified that, since the accident, her hips never "stayed in place," and that she could walk only because the chiropractor "puts them back in place." (*Id.*)  She tried injections for her lower back, but they caused more pain. (T. 49-50).

Plaintiff also testified to bilateral shoulder pain. (T. 50).  She had two surgeries on her right shoulder and had recently torn a ligament in her left shoulder. (*Id.*) Plaintiff testified that all of her impairments made it difficult for her to sleep at night.[7] (*Id.*)  She stated that, during one of her shoulder surgeries, the physicians "cut" her biceps muscle, and that it had never been the same, and any lifting caused her terrible pain. (T. 50-51).  She testified that she got migraines "almost daily," but then she stated that she got them two or three times per week. (T. 51).  Plaintiff stated that if she caught the headache early enough, she could take Tylenol and sit for twenty minutes, but otherwise, she was bedridden in a dark room for two hours. (T. 51).

Plaintiff testified that she had swelling everywhere and took pills to alleviate it. (T. 52).  She testified that she was better in the morning, but as the day wore on, the swelling came back in her chest and in her stomach. (*Id.*)  She stated that the stomach swelling was due to ulcerative colitis and celiac disease. (*Id.*)  Plaintiff also stated that she would swell if she got cold because she was "allergic to the cold." (*Id.*)  Plaintiff also testified that she was very sensitive to medication and had "side effects." (*Id.*)  She

---

[7] Plaintiff later stated that she slept only four hours per night, and she was exhausted in the morning. (T. 53).

took only half the pain medication dosage because the medication made her "coo-coo," and she could not take muscle relaxants because she "can't function." (*Id.*)  Plaintiff testified that she also had acid reflux, liver disease, and diabetes. (T. 52).

Plaintiff testified that she forces herself to get dressed in the morning. (T. 53). She stated that the pain in her hands was so bad that she could not even lift a half-gallon of milk, she could not sit for more than ten minutes without pain, and that she could not stand for more than ten minutes before getting a headache and horrible pain in her upper back and feet. (*Id.*)  Plaintiff stated that she could walk approximately ten to fifteen minutes, but then she got tired and got spasms in her legs. (T. 53-54).

Plaintiff testified that she did very little cooking, and that her husband did all the household chores, such as laundry, grocery shopping, and outdoor maintenance. (T. 54).  Plaintiff stated that she got up in the morning, took care of her cats, went down to the store to get the mail, answered the telephone at the store, set up repair appointments with customers,[8] talked to customers, and then closed the store. (T. 55).  After closing the store, she went to physical therapy, the chiropractor, or to her other doctors' appointments. (*Id.*)  She went to see her son and her two-year-old granddaughter,[9] and spoke with her mother on the telephone. (*Id.*)  Plaintiff testified that she occasionally went to church, did not go to the movies, but was trying to go to concerts. (T. 56).  She stated that she saw "Cher" in Buffalo. (*Id.*)  Plaintiff testified that using the computer

---

[8] As stated above, plaintiff contracted with another individual, who actually performed the repairs. (T. 43, 55, 56).

[9] Plaintiff testified that she did not babysit for her granddaughter because she could not lift her. (T. 56).

was painful for her hands, and she commented that she did "a lot of keyboard inputting" for her son the day before, and she was "paying for it." (*Id.*)

The VE testified that plaintiff's previous work included "communication sales," which is classified as "light" work, with an SVP of 6.[10] (T. 59). The VE also identified plaintiff's previous work as a radio account manager, without the additional descriptive details. (T. 58). The skills obtained in these occupations would be transferable to semi-skilled work with minimal adjustment. (*Id.*) The ALJ then asked the VE to assume an individual of plaintiff's age, education, and prior work experience who could walk or stand for six hours and sit for six hours out of an eight-hour work day; could occasionally climb stairs, but never ropes, ladders, or scaffolds; could occasionally stoop, kneel, crouch, and crawl; could frequently handle, finger, and feel; and could occasionally reach overhead; but must avoid unprotected heights and hazardous moving machinery. (*Id.*)

Based on this hypothetical question, the VE testified that plaintiff could return to her former work, either in communication equipment sales or as an account manager. (T. 59). The ALJ then asked the VE to assume an individual who could only lift and carry ten pounds, but could perform all the other functions listed in the first hypothetical. (T. 59-60). The VE testified that plaintiff could still perform the jobs of ads clerk, order taker, and invoice control clerk. (T. 60). However, in a third hypothetical, the ALJ asked whether plaintiff could still perform her past relevant work

---

[10] SVP stands for Specific Vocational Preparation. https://www.onetonline.org/help/online/svp. The SVP number correlates to the amount of time required for a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job situation. *Id.* An occupation with an SVP of 6 is considered skilled work. *Id.*

if she could only "occasionally" handle, finger, and feel.  The VE testified that this individual could not perform either her previous "light" occupation, nor could she perform the additional occupations that she discussed. (T. 60-61).

The ALJ's final hypothetical asked the VE to assume the same individual, who could occasionally lift ten pounds, but could not frequently lift and carry. (T. 61). Further, the individual could walk or stand for six hours per day, but for no more than ten minutes a time.  She could never reach overhead, occasionally reach forward, occasionally finger, but could never handle, push, or pull. (*Id.*)  Finally, she could never climb, balance, stoop, crouch, kneel, or crawl. (*Id.*)  The VE testified that such an individual could not perform any competitive employment. (*Id.*)

There is a substantial amount of medical evidence in the administrative record. Rather than reciting the evidence at the outset, I will discuss the relevant materials in my analysis of plaintiff's claims.

## IV.   THE ALJ'S DECISION

At step one of the sequential evaluation, the ALJ found that plaintiff met her insured status requirements through June 30, 2020, and that plaintiff did not perform substantial gainful activity since her alleged onset date. (T. 12)  At step two, the ALJ found that plaintiff had the following severe impairments: disorder of the back; degenerative joint disease of the knees, right shoulder, and both feet; osteoarthritis of the thumbs; and obesity. (*Id.*)

The ALJ found that the plaintiff had the following non-severe impairments: autoimmune disease, celiac disease, chronic hip dislocation, severe migraines, and

depression. (*Id.*)  He based this determination on the following findings: the impairments did not cause more than a minimal functional limitation on plaintiff's ability to work; they were being adequately controlled with medication; they had not persisted for a continuous period of twelve months, and/or they were resolved with treatment. (T. 12-13).  The ALJ also found that plaintiff's fibromyalgia was not a medically determinable impairment. (T. 13).  The ALJ stated that, that notwithstanding a history of diagnosis and treatment for fibromyalgia, the evidence did not show "sufficient objective medical evidence in the form of either medical signs or laboratory findings that would support such a diagnosis." (*Id.*)  Even though the ALJ found various of plaintiff's alleged impairments non-severe, he stated that he considered "all of the [plaintiff's] impairments and all of the records when assessing the [plaintiff's RFC] . . . ." (T. 15).

At step three, the ALJ found that plaintiff did not have an impairment or combination of impairments that rose to Listing-level severity. (T. 15-16).  In making this determination, the ALJ considered Listings 1.02 (major dysfunction of a joint), 1.04 (disorders of the spine).[11] (T. 15).  At step four, the ALJ found that plaintiff had the RFC to lift twenty pounds, occasionally and ten pounds frequently. (T. 16).  He found that plaintiff could walk or stand for six hours and sit for six hours out of an eight-hour work day. (*Id.*)  She could occasionally climb stairs, but never ropes, ladders, or scaffolds.  Plaintiff could occasionally stoop, kneel, crouch, and crawl. (*Id.*)

---

[11] The court notes that, as of April 2021, the Social Security Administration has revised and renumbered the Listings for Musculoskeletal Impairments. 20 C.F.R. Pt. 404, Subpt. P, App.1, § 1.00-1.23.  The previous Listings apply to this case, and there is no dispute regarding step three.  Thus, the court will not elaborate further on these revisions.

She could frequently handle, finger, and feel, occasionally reach overhead, but must avoid unprotected heights and hazardous moving machinery. (*Id.*)  The ALJ stated that he considered the medical evidence, including opinion evidence, together with all of plaintiff's symptoms and the extent to which they were consistent with the medical and other evidence. (T. 16-19).  Based on his RFC finding, the ALJ determined that plaintiff could perform her past relevant work as a sales account manager and as a communication salesperson. (T. 20).  Thus, the ALJ determined that plaintiff was not disabled. (T. 20-21).

## V.   ISSUES IN CONTENTION

Plaintiff raises the following arguments in support of her position that the ALJ's decision is not supported by substantial evidence:

1.    The ALJ failed to properly consider all the relevant evidence. (Pl.'s Br. at 8-13) (Dkt. No. 13).

2.    The ALJ's RFC determination was not supported by substantial evidence. (Pl.'s Br. at 14-17).

Defendant argues that the ALJ's decision was supported by substantial evidence, and the complaint should be dismissed. (Def.'s Br. at 4-21) (Dkt. No. 17).  For the following reasons, this court agrees with defendant and will affirm the Commissioner's decision.

## VI.   Medically Determinable Impairment (Step Two)

### A.    Legal Standards

For purposes of the Act, a plaintiff's disability must be caused by "medically determinable physical or mental impairment[s]." 42 U.S.C. § 1382c(a)(3)(A).  At step

two, the plaintiff also bears the burden of presenting evidence establishing that her "medically determinable" impairment is severe. *Rhondalee T. v. Berryhill*, No. 3:17–CV–1241 (CFH), 2019 WL 1100267, at *5 (N.D.N.Y. Mar. 8, 2019) (citing *Taylor v. Astrue*, 32 F. Supp. 3d 253, 265 (N.D.N.Y. 2012)).  A severe impairment is one that significantly limits the plaintiff's physical and/or mental ability to do basic work activities.  *See* 20 C.F.R. §§ 404.1520(c), 416.920(c); *see also* 20 C.F.R. §§ 404.1521(a), 416.921(a) (noting that an impairment is not severe at step two if it does not significantly limit a claimant's ability to do basic work activities).

### B.     Analysis

In this case, the ALJ found that plaintiff's fibromyalgia was not "medically determinable," and thus never considered whether the impairment was "severe" for purposes of the Act.  Plaintiff argues that the ALJ erred in determining that her fibromyalgia was not a medically determinable impairment. (Pl.'s Br. at 13).  Although plaintiff concedes that an individual's statements alone are insufficient to establish a medically determinable impairment, she argues that the ALJ erred in finding that plaintiff's fibromyalgia was based on "self-diagnosis." (*Id.*)

Plaintiff's argument is misplaced.  The ALJ engaged in a lengthy discussion of plaintiff's fibromyalgia. (T. 13).  He stated that, while the medical evidence of record did "document a history of diagnosis and treatment for fibromyalgia, . . . the record does not include sufficient objective medical evidence in the form of either medical signs or laboratory findings that would support such a diagnosis." (*Id.*)  The ALJ did not base his finding on the fact that plaintiff engaged in "self-diagnosis."  The ALJ was

13

only stating that "a claimant's statements alone are insufficient to establish a medically determinable impairment." (*Id.*)

The ALJ stated that the record contained no record of any "trigger point testing," supporting a fibromyalgia diagnosis. (*Id.*)  Some of the medical records list a diagnosis of fibromyalgia, but none of those records actually diagnose the impairment.  The only medical provider who assessed trigger points in his report was consultative physician, Dr. Elke Lorensen, who stated that plaintiff had "six positive trigger points identified for fibromyalgia."[12] (T. 13, 640).  The ALJ then stated that SSR 12-2p[13] describes eleven trigger points, and while the ruling does not "require"[14] all eleven positive trigger points to establish a medically determinable impairment, "it does require evidence that other disorder[s] that could cause the claimant's symptoms were excluded. (T. 13).

The ALJ stated that plaintiff had a long history of "various conditions that could explain [her] symptoms, such as her degenerative disc disease, osteoarthritis, and an autoimmune disease. (*Id.*)  The ALJ also noted that most of the plaintiff's medical records, do not include fibromyalgia among her multiple diagnoses and past medical

---

[12] Dr. Lorensen did list fibromyalgia as one of the plaintiff's diagnoses. (T. 641).

[13] SSR 12-2p, 2012 WL 3104869 (July 23, 2012) provides guidelines for evaluating a diagnosis of fibromyalgia.

[14] Under SSR 12-2p, SSA determines whether fibromyalgia is a medically determinable impairment by using either the 1990 or the 2010 criteria established by the American College of Rheumatology. 2012 WL 3104869, at *2. The 1990 criteria require evidence of 1) a history of widespread pain; 2) at least 11 positive tender points on physical examination; and 3) evidence that other disorders that could cause the symptoms or signs were excluded. *Id.* at *2-3. The 2010 criteria are similar, except that, instead of tender points, the individual may show "repeated manifestations of six or more fibromyalgia symptoms, signs, or co-occurring conditions," and evidence that other disorders that could cause the symptoms or signs were excluded. *Id.* at *3.

history.[15] (*See e.g.* T. 897, 921, 946, 973, 996-97, 1074). This included the records of her treating provider, PA Tontarski.[16] (*See e.g.*T. 907-908).  One of PA Tontarski's notes stated that he was referring plaintiff to a rheumatologist for evaluation of "fibro" and arthritis. (T. 1076).  However, as noted by defendant, there is no record of such a referral or subsequent diagnosis of fibromyalgia by a rheumatologist.

On March 28, 2017, Dr. Ivan Montalvo from the Samaritan Pain Center examined plaintiff, finding "restriction of movement" and "trigger points," but diagnosed only "myalgia." (T. 932).  Myalgia is a generic term for "pain in one or more muscles. https://www.merriam-webster.com/dictionary/myalgia.

This case is distinguishable from *Brandy L. v. Kijakasi*, No. 3:20-CV-1127 (DJS), 2022 WL 675709, at *4 (N.D.N.Y. Mar. 7, 2022).  In *Brandy L.*, Magistrate Judge Stewart reversed the Commissioner's decision after the ALJ found that plaintiff's fibromyalgia was not a medically determinable impairment, but failed to properly consider that the impairment was documented several times in the record, and failed to even mention that plaintiff's medical providers performed tests to rule out other disorders. *Id.*  In remanding the case for further review, Judge Stewart stated that

> [i]t may be that substantial evidence would support a
> well-reasoned conclusion that Plaintiff failed to establish the
> exclusion of other causes for her symptoms. The Court

---

[15] In March of 2019, Dr. Latif included fibromyalgia in his list of "Assessments," but he never mentions fibromyalgia or positive trigger points in his examination, and he does not indicate that it is his diagnosis. (T. 858-59).  As stated above, the ALJ notes that there are multiple references to fibromyalgia in the record. (T. 13).

[16] Even if PA Tontarski had included fibromyalgia in his assessment of plaintiff's impairments, he was not an acceptable medical source at the time.  The diagnosis must be made by an acceptable medical source. 2012 WL 3104869, at *2.

concludes only that the ALJ erred in finding that there was no evidence of exclusion, and that remand is required for that complete review of whether Plaintiff has carried her burden to establish fibromyalgia was a severe impairment.

*Id.* (citing *Dickinson v. Berryhill*, No. 1:16-CV-185, 2017 WL 2492614, at *4 (N.D. Ind. June 9, 2017) ("Plaintiff has a dual burden of production and persuasion at step two.")).

In this case, the ALJ engaged in a lengthy analysis, which was properly based on the medical evidence.  At best, there is conflicting evidence in the record regarding a diagnosis of fibromyalgia.  Conflicts in the evidence are for the ALJ to resolve. *Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002). Thus, the ALJ's finding that plaintiff's fibromyalgia was not a medically determinable impairment was supported by substantial evidence.[17]

## VII.  **RFC/Weight of the Evidence**

### A.    **Legal Standards**

#### 1.    **RFC**

RFC is "what [the] individual can still do despite his or her limitations. Ordinarily, RFC is the individual's maximum remaining ability to do sustained work

---

[17] The court notes that Magistrate Judge Stewart also found that the ALJ's error at step two was not harmless. 2022 WL 675709, at *4.  Other cases have held that harmless error does not apply at step two if the ALJ improperly determines whether an impairment is "medically determinable," because unlike a non-severe impairment which is considered during later steps of the sequential analysis, an impairment which is not medically determinable is not later considered when determining RFC. *See e.g. Dunworth v. Comm'r of Soc. Sec.*, No. 19-CV-2 (JLS), 2020 WL 4432570, at *4 (W.D.N.Y. July 30, 2020) (the step two harmless error doctrine applies only to ALJ decisions regarding whether an impairment is severe, and not to decisions regarding whether the impairment is medically determinable).  Because, I have found that the ALJ's step two determination is supported by substantial evidence, I do not need to discuss harmless error, nor do I need to determine whether I would agree with the *Dunworth* opinion.

activities in an ordinary work setting on a regular and continuing basis. . . ."  A "regular and continuing basis" means eight hours a day, for five days a week, or an equivalent work schedule.  *Balles v. Astrue*, No. 3:11-CV-1386 (MAD), 2013 WL 252970, at *2 (N.D.N.Y. Jan. 23, 2013) (citing *Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999) (quoting SSR 96–8p, 1996 WL 374184, at *2)); *Babcock v. Berryhill,* No. 5:17-CV-00580 (BKS), 2018 WL 4347795, at *12-13 (N.D.N.Y. Sept. 12, 2018); *Tankisi v. Comm'r of Soc. Sec.*, 521 F. App'x 29, 33 (2d Cir. 2013); *Stephens v. Colvin*, 200 F. Supp. 3d 349, 361 (N.D.N.Y. 2016).

In rendering an RFC determination, the ALJ must consider objective medical facts, diagnoses, and medical opinions based on such facts, as well as a plaintiff's subjective symptoms, including pain and descriptions of other limitations.  20 C.F.R. §§ 404.1545, 416.945.  *See Martone v. Apfel*, 70 F. Supp. 2d 145, 150 (N.D.N.Y. 1999) (citing *LaPorta v. Bowen*, 737 F. Supp. 180, 183 (N.D.N.Y. 1990)); *Kirah D. v. Berryhill*, No. 3:18-CV-0110 (CFH), 2019 WL 587459, at *8 (N.D.N.Y. Feb 13, 2019); *Genier v. Astrue,* 606 F.3d 46, 49 (2d Cir. 2010).  An ALJ must specify the functions plaintiff is capable of performing, and may not simply make conclusory statements regarding a plaintiff's capacities.  *Roat v. Barnhart,* 717 F. Supp. 2d 241, 267 (N.D.N.Y. 2010); *Martone v. Apfel*, 70 F. Supp. 2d at 150 (citing *Ferraris v. Heckler*, 728 F.2d 582, 588 (2d Cir. 1984); *LaPorta v. Bowen*, 737 F. Supp. at 183, *Stephens v. Colvin,* 200 F. Supp. 3d 349, 361 (N.D.N.Y. 2016); *Whittaker v. Comm'r of Soc. Sec.*, 307 F. Supp. 2d 430, 440 (N.D.N.Y. 2004).  The RFC assessment must also include a narrative discussion, describing how the evidence supports the ALJ's conclusions,

citing specific medical facts, and non-medical evidence.  *Natashia R. v. Berryhill*, No. 3:17-CV-01266 (TWD), 2019 WL 1260049, at *11 (N.D.N.Y. Mar. 19, 2019) (citing SSR 96-8p, 1996 WL 374184, at *7).

### 2.   Weight of the Evidence

In making a disability determination, the ALJ weighs all the evidence of record and carefully considers medical source opinions about any issue. SSR 96-5p, 1996 WL 374183, at *2-3 (1996).  Under 20 C.F.R. §§ 404.1527(e) and 416.927(e), some issues are not "medical issues," but are "administrative findings."  The responsibility for determining these issues belongs to the Commissioner.  *See* SSR 96-5p, 1996 WL 374183, at *2.  These issues include whether the plaintiff's impairments meet or equal a listed impairment; the plaintiff's RFC; how the vocational factors apply; and whether the plaintiff is "disabled" under the Act. *Id.*

In evaluating medical opinions on issues that are reserved to the Commissioner, the ALJ must apply the factors listed in 20 C.F.R. §§ 404.1527(d) and 416.927(d).  The ALJ must clearly state the legal rules that he applies and the weight that he or she accords the evidence considered.  *Drysdale v. Colvin*, No. 14-CV-722, 2015 WL 3776382, at *2 (S.D.N.Y. June 16, 2015) (citing *Rivera v. Astrue*, No. 10 Civ. 4324, 2012 WL 3614323, at *8 (E.D.N.Y. Aug. 21, 2012) (citation omitted)).

The regulations regarding the evaluation of medical evidence were amended for claims filed after March 27, 2017, and several of the prior Social Security Rulings, including SSR 96-2p, have been rescinded.  According to the new regulations, the Commissioner "will no longer give any specific evidentiary weight to medical opinions;

this includes giving controlling weight to any medical opinion." Revisions to Rules Regarding the Evaluation of Medical Evidence ("Revisions to Rules"), 2017 WL 168819, 82 Fed. Reg. 5844, at 5867-68 (Jan. 18, 2017), see 20 C.F.R. §§ 404.1520c(a), 416.920c(a). Instead, the Commissioner must consider all medical opinions and "evaluate their persuasiveness" based on the following five factors: supportability; consistency; relationship with the claimant; specialization; and "other factors." 20 C.F.R. §§ 404.1520c(a)-(c), 416.920c(a)-(c).

Under the regulations applicable to individuals filing before March 27, 2017, the ALJ's analysis was subject to the "treating physician rule." "Although the treating physician rule generally requires deference to the medical opinion of a claimant's treating physician, . . . the opinion of the treating physician is not afforded controlling weight where . . . the treating physician issued opinions that are not consistent with other substantial evidence in the record . . . ." *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004); *Veino v. Barnhart*, 312 F.3d at 588; 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).

If an ALJ decides not to give the treating source's records controlling weight, then he must explicitly consider the four *Burgess* factors: "(1) the frequen[cy], length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist." *Estrella v. Berryhill*, 925 F.3d 90, 95-96 (2d Cir. 2019) (quoting *Burgess v. Astrue*, 537 F. 3d 117, 120 (2d Cir. 2008)). "[T]he ALJ must 'give good reasons in [its] notice of determination or decision for the weight [it

gives the] treating source's [medical] opinion.' " *Id.* at 96 (citing *Halloran v. Barnhart*, 362 F.3d at 32).  Should an ALJ assign less than controlling weight to a treating physician's opinion and fail to consider the above-mentioned factors, this is a procedural error.  *Id.*  It is impossible to conclude that the error is harmless unless a "searching review of the record . . . assures us that the substance of the treating physician rule was not traversed." *Id.*

For claims filed prior to March 27, 2017, the Social Security Administration categorized nurse practitioners and physicians' assistants as "other medical sources," whose opinion may be considered as to the severity of a claimant's impairment and ability to work, but who are not necessarily entitled to the weight afforded to a treating physician. 20 C.F.R. §§ 416.913(d)(1), 404.1513(d)(1).[18]  The regulations direct an ALJ to use various factors in evaluating the opinions of these "other medical sources," including frequency of treatment, consistency with other evidence, degree of supporting evidence, thoroughness of explanation, and whether the source has an area of expertise. 20 C.F.R. §§ 404.1527(c) and (f), 416.927(c) and (f).[19]  The Second Circuit has stated

---

[18] The current version of these regulations (applicable to cases filed after March 27, 2017) no longer differentiates between "acceptable" and "other" medical sources.  The sections are entitled "Categories of Evidence," and define the differences between objective medical evidence, medical opinion, "other medical evidence," and evidence from non-medical sources.  The evaluation of opinion evidence for claims filed prior to March 27, 2017 is now located at 20 C.F.R. § 404.1527 and 416.927 and does refer to acceptable versus other sources.

[19] The new regulations now contain separate sections for claims filed prior to, and after, March 27, 2017.  As stated above, sections 404.1527 and 416.927 contain the regulations for cases filed prior to March 27, 2017.  In sections 404.1527(f)(1) and 416.927(f)(1), the regulations refer to 404.1527(c)(1)-(c)(6) and 416.927(c)(1)-(c)(6) which contain the specific factors by which the Commissioner evaluates "acceptable medical sources," but states that "not every factor for weighing opinion evidence will apply in every case because the evaluation of an opinion from a medical source who is not an acceptable medical source or from a nonmedical source depends on the particular facts in each case." *Id.*

that "'the ALJ has discretion to determine the appropriate weight to accord [the other source's] opinion based on all the evidence before him." *House v. Comm'r of Soc. Sec.*, 32 F. Supp. 3d 138, 151 (N.D.N.Y. 2012) (quoting *Diaz v. Shalala,* 59 F. 3d 307, 313–14 (2d Cir. 1995)) (some alterations in original).

### 3.   Credibility/Consistency

In evaluating a plaintiff's RFC for work in the national economy, the ALJ must take the plaintiff's reports of pain and other symptoms into account. *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010).  The ALJ must "'carefully consider'" all the evidence presented by claimants regarding their symptoms, which fall into seven relevant factors including 'daily activities' and the 'location, duration, frequency, and intensity of [their] pain or other symptoms.'" *Del Carmen Fernandez v. Berryhill*, No. 18-CV-326, 2019 WL 667743, at *9 (S.D.N.Y. Feb. 19, 2019) (citing 20 C.F.R. § 404.1529(c)(3); Social Security Ruling (SSR) 16-3p, *Titles II and XVI: Evaluation of Symptoms in Disability Claims*, 81 FR 14166-01 at 14169-70, 2016 WL 1020935 (Mar. 16, 2016)).

In 2016 the Commissioner eliminated the use of term "credibility" from the "sub-regulatory policy" because the regulations themselves do not use that term. SSR 16-3p, 81 FR at 14167.  Instead, symptom evaluation tracks the language of the regulations.[20]

The evaluation of symptoms involves a two-step process.  First, the ALJ must determine, based upon the objective medical evidence, whether the medical impairments "could reasonably be expected to produce the pain or other symptoms

---

[20] The standard for evaluating subjective symptoms has not changed in the regulations.  Rather, the term "credibility" is no longer used, and SSR 16-3p makes it clear that the evaluation of the claimant's symptoms is not "an evaluation of the claimant's character." 81 FR at 14167.  The court will remain consistent with the terms as used by the Commissioner.

alleged . . . ."  20 C.F.R. §§ 404.1529(a), (b); 416.929(a), (b).  if so, at the second step, the ALJ must consider "'the extent to which [the claimant's] alleged functional limitations and restrictions due to pain or other symptoms can reasonably be accepted as consistent with the [objective medical evidence] and other evidence to decide how [the claimant's] symptoms affect [her] ability to work.'"  *Barry v. Colvin*, 606 F. App'x 621, 623 (2d Cir. 2015) (citing inter alia 20 C.F.R. § 404.1529(a); *Genier v. Astrue*, 606 F.3d at 49) (alterations in original).[21]

If the objective medical evidence does not substantiate the claimant's symptoms, the ALJ must consider the other evidence. *Cichocki v. Astrue*, 534 F. App'x 71, 76 (2d Cir. 2013) (citing superceded SSR 96-7p).  The ALJ must assess the claimant's subjective complaints by considering the record in light of the following symptom-related factors: (1) claimant's daily activities; (2) location, duration, frequency, and intensity of claimant's symptoms; (3) precipitating and aggravating factors; (4) type, dosage, effectiveness, and side effects of any medication taken to relieve symptoms; (5) other treatment received to relieve symptoms; (6) any measures taken by the claimant to relieve symptoms; and (7) any other factors concerning claimant's functional limitations and restrictions due to symptoms. 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3).

## B.    Analysis

Plaintiff frequently saw Physician's Assistant ("PA") Frederick Tontarski, from

---

[21] The court in *Barry* also cited SSR 96–7p, 1996 WL 374186, at *2 (July 2, 1996) which was superceded by SSR 16-3p.  As stated above, the factors considered are the same under both rulings.  The 2016 ruling has removed the emphasis on "credibility."

Carthage Area Hospital, Philadelphia Medical Center, who submitted a physical Medical Source Statement ("MSS"), dated March 20, 2019. (T. 860-65).  In this check-box form, PA Tontarski opined that plaintiff could only occasionally lift and/or carry up to ten pounds, could only sit for ten minutes at a time for a total of two hours in an eight-hour work day, could stand for ten minutes for a total of three hours in a work day, and could walk for twenty minutes for a total of four hours in a work day. (T. 861). He also opined that plaintiff could never reach overhead or handle with either hand, and could occasionally finger with the right hand, but never finger with the left hand. (*Id.*) She could occasionally reach in other directions and occasionally push and pull with both hands. (*Id.*)  PA Tontarski opined that plaintiff could continuously feel with both hands. (*Id.*)

The MSS further stated that plaintiff could occasionally climb stairs and ramps, but could never climb ladders or scaffolds, balance, kneel, stoop, crouch, or crawl. (T. 863).  She could frequently operate a motor vehicle, but could only occasionally be exposed to moving mechanical parts, humidity and wetness, dust, odors, and fumes, vibrations, and noise.  She could never be exposed to unprotected heights, extreme cold or extreme heat. (*Id.*)  In a section listing "activities," PA Tontarski checked boxes indicating that plaintiff could shop, travel without assistance, ambulate without using a wheelchair, two canes, or two crutches, could walk a block at a reasonable pace on uneven surfaces, climb a few steps, prepare a simple meal, feed herself, care for her personal hygiene, and "sort, handle, or use paper/files." (T. 865).  There were no narratives in the form, explaining how PA Tontarski arrived at his opinion,

23

notwithstanding several questions asking the provider to "identify" particular medical or clinical findings which supported his opinion. (T. 860-865).

The only written "explanation" was a single word: "MRI," and it appeared under a question which asked whether any other "work-related activities" were affected by the plaintiff's impairments, and what clinical findings supported the stated limitations. (T. 865).  PA Tontarski did not list any additional work-related activities, but simply wrote MRI in the space provided. (*Id.*)

The ALJ gave this MSS no weight, finding that, while PA Tontarski had a treating relationship with plaintiff, his "opinions" were "not well supported by the medical evidence of record," including his own treatment notes. (T. 19).  The ALJ found that PA Tontarski's treatment notes did not document any significant deficits or clinical findings reasonably consistent with the conclusions in the MSS. (*Id.*) (citing Exs. E45F and E54F, T. 904-19, 1072-76).  The ALJ also found that the restrictions listed in PA Tontarski's MSS were inconsistent with other physical examinations throughout the record, including the consultative examination conducted by Dr. Elke Lorensen, M.D. (*Id.*) (T. 638-42).

The ALJ specifically discussed PA Tontarski's opinion that the plaintiff could never reach over head or handle with either extremity, stating that no physical examinations in the record, including Dr. Lorensen's had documented any serious limitations in range of motion or loss of dexterity in the upper extremities. (T. 19).  The ALJ also commented that PA Tontarski's MSS did not provide any explanation, or reference medical signs or findings of record, to support his conclusions.

The ALJ's determination was supported by substantial evidence.  Under the regulations applicable in plaintiff's case, a physician's assistant was considered under the category of "other medical sources."  These other medical sources were not afforded the controlling weight of a treating physician, but their opinions were still required to be properly evaluated by considering the frequency of treatment, consistency with other evidence, degree of supporting evidence, thoroughness of explanation, and whether the source has an area of expertise–the same factors as those used for acceptable medical sources. *Michael S. v. Kijakazi*, No. 20-CV-6340, 2021 WL 2917694, at *3 (W.D.N.Y. July 12, 2021) (citing 20 C.F.R. § 416.927(c); *Pike v. Colvin*, No. 14-CV-159, 2015 U.S. Dist. LEXIS 35143 at *11, 2015 WL 1280484, at *5, 8 (W.D.N.Y. Mar. 20, 2015) (quotation and alterations omitted)).  "The ALJ 'does not have to explicitly walk through these factors,' so long as the court can conclude that the ALJ 'applied the substance' of the listed factors and provided 'good reasons' for the weight given to the medical source's opinion." *Pike*, 2015 WL 1280484, at *5. (quoting *Hall v. Colvin*, 37 F. Supp. 2d 614, 625 (W.D.N.Y. 2014)).

In this case, the ALJ gave specific reasons for giving PA Tontarski's restrictive MSS no weight.  The ALJ began his analysis by noting that PA Tontarski had a treating relationship with the plaintiff. (T. 19).  In addition, the ALJ did not reject PA Tontarski's MSS solely based on the fact that he was not an acceptable medical source. In fact, the ALJ did not even mention that fact.  Instead, the ALJ considered the consistency, supportability, and thoroughness of PA Tontarski's explanation, finding that the "record as a whole fails to support the extreme limitations." (*Id.*)

Dr. Lorensen consultatively examined plaintiff on April 25, 2017 and found that plaintiff had "no gross limitations to sitting, standing, walking, or handling small objects with the hands." (T. 641). He found that plaintiff had mild to moderate limitations in bending, reaching, lifting, and turning the head. (*Id.*) The ALJ also relied upon the May 26, 2017 opinion submitted by Dr. I. Souk, M.D., a non-examining state agency medical consultant, who reviewed the record, including Dr. Lorensen's opinion, and found that plaintiff could perform a full range of light work with the following additional limitations: she could only occasionally balance, stoop, kneel, crouch, crawl, and climb ramps, ropes, ladders, or scaffolds. (T. 73). Dr. Souk found that plaintiff had no manipulative limitations. (*Id.*) Neither of these consultative opinions found the extreme limitations stated by PA Tontarski. The ALJ is entitled to rely upon the opinions of both examining and non-examining State agency medical consultants, since such consultants are deemed to be qualified experts in the field of social security disability. *See* 20 C.F.R. §§ 404.1512(b)(6), 404.1513(c), 404.1527(e). *See also Christopher R. v. Comm'r of Soc. Sec.*, No. 1:20- CV-1082 (ATB), 2022 WL 675708, at *6 (N.D.N.Y. Mar. 2, 2022) (the regulations permit the opinions of non-examining sources to override the opinions of treating sources provided they are supported by the evidence in the record); *Baszto v. Astrue*, 700 F. Supp. 2d 242, 249 (N.D.N.Y. 2010) ("[A]n ALJ is entitled to rely upon the opinions of both examining and non-examining State agency medical consultants, since such consultants are deemed to be qualified experts in the field of social security disability.").

In addition to the opinions of the consultative physicians, the ALJ considered PA

Tontarski's contemporaneous examination notes. (T. 19, 904-919, 1072-76).  In his MSS, PA Tontarski stated that plaintiff could "never" reach overhead or handle with either hand, and could occasionally finger with the right hand, but never finger with the left hand.  However, on May 8, 2018, plaintiff went to see PA Tontarski for knee pain and denied symptoms "other than stated above." (T. 906).  His examination showed that plaintiff's neck was grossly within normal limits, strength was 5/5, and her range of motion was "physiologic."[22] (T. 907).  Her spine was within normal limits, with a strength of 5/5.  Her upper and lower extremities were listed as normal, with no instability, and with strength 5/5 bilaterally.  There was no instability, no tenderness, and she had full range of motion. (*Id.*)  Upper extremity strength of 5/5 is inconsistent with the above stated upper body restrictions to handling, fingering, and reaching.

On June 18, 2018, just after her knee surgery, plaintiff went to PA Tontarski, complaining of pain in her upper back. (T. 909-910).  Physical examinations showed that plaintiff's neck was grossly within normal limits, was supple with a normal range of motion, and had 5/5 strength. (T. 911).  Her spine did show "some limited active flexion with pain," but she had normal posture and no obvious instability. (*Id.*)  Both her upper and lower extremities were "normal to inspection," there was no tenderness bilaterally, no instability, and her strength was 5/5 bilaterally. (T. 911-12).  She had normal muscle tone and bulk. (*Id.*)

On July 13, 2018, plaintiff's physical examination was almost identical to her

---

[22] Physiologic[al] is another word for "normal." https://www.merriam-webster.com/dictionary/physiological.  Both physiologic and physiological are used interchangeably. https://www.thefreedictionary.com/physiologic.

June visit, but there was no reference to any limitation in spinal range of motion. (T. 916-17).  In addition, PA Tontarski examined plaintiff's feet because of her diabetes, but found that her feet were normal to inspection and palpation, and her sensation was grossly intact to position, vibration, and pinprick. (T. 917).

On March 20, 2019, PA Tontarski saw plaintiff for "review of disability papers." (T. 1075).  This was the same day that he completed the check-box MSS.  Under the heading "Subjective," PA Tontarski stated that the pain in her thumb interfered with her ability to grasp and manipulate items, and that she had pain in her feet, low back, and neck which did not allow her to stand or sit for "prolonged periods." (*Id.*)  However, unlike his previous reports, this report did not contain any reference to an objective contemporaneous examination of her back or her extremities. (*Id.*)  With respect to any body parts relevant to her claim, the report stated only that plaintiff's neck had "painful movement." (*Id.*)  His recommendation was for plaintiff to continue her medications and remain active. (T. 1076).  He encouraged her to exercise. (*Id.*)

The ALJ's determination that the above findings were not consistent with PA Tontarski's check box form is supported by substantial evidence.  The ALJ also noted that PA Tontarski did not provide an explanation for his asserted limitations in the space provided on the form.  Plaintiff argues that PA Tontarski's notes provided the explanation, but as shown above, his contemporaneous notes were inconsistent with the conclusions expressed in the check-box form, and he did not explain this discrepancy or how his conclusions followed from his examinations.

The ALJ also found that the record as a whole did not support the extreme

limitations suggested by PA Tontarski.  The ALJ stated that "physical examinations throughout the record, including Dr. Lornensen, have not documented any serious limitations in range of motion or loss of dexterity in the upper extremities." (T. 19). Earlier in his analysis, the ALJ stated that "while exams frequently show some subjective tenderness or painful range of motion in the spine, they also consistently indicate that she is able to walk without deficit, and she has good strength, range of motion, sensation, and reflexes in all her extremities." (T. 18).

The ALJ cited various records, throughout the period in question,[23] which supported his findings.  He cited a September 19, 2017 report by Dr. Thomas W. Kneifel, M.D., to whom plaintiff was referred for her hip pain by one of her primary care providers, Dr. Tahir Anwar, D.O. (T. 18, 673-80).  After reviewing plaintiff's past medical history, Dr. Anwar stated that, subjectively, plaintiff had "pain all the time." (T. 673).  However, he also stated that "[s]he is able to walk unlimited distances." (*Id.*) Objectively, Dr. Anwar's examination resulted in normal findings from plaintiff's feet to her back and both hips, with normal range of motion and 5/5 strength throughout. (T. 674-75).

The ALJ cited a March 22, 2018 report, written by PA Kathryn E. Doremus from

---

[23] The ALJ considered that plaintiff recovered well from two shoulder surgeries which occurred prior to her onset date. (T. 17) (citing T. 498 - plaintiff's pain was controlled without medication after the second surgery and 499-500 - patient doing extremely well). The ALJ also considered that plaintiff had knee surgery after her onset date. (T. 17).  The ALJ cited a June 6, 2018 surgery to repair a torn meniscus in her right knee. (T. 17) (citing T. 759, 787-88).  The ALJ stated that ten days after the surgery, plaintiff was able to ambulate without difficulty and by June 21, 2018, her knee looked excellent, there was no swelling, and she had full range of motion. (T. 797 - knee looks excellent with good range of motion, and no swelling at all, 801 - July 11, 2018 - full active ROM right knee). The ALJ even discussed the fact that plaintiff developed some rash after the surgery, due to an apparent latex allergy, but there were no other significant complications. (T. 17).

the North Country Orthopedic Group,[24] who examined plaintiff's right knee.[25] (T. 770-72).  Plaintiff stated that her right knee was painful, and that she had some "subjective instability." (T. 770).  In her assessment, PA Doremus stated that the knee exam was "positive," and she stated that on a previous examination by another provider, plaintiff was diagnosed with a Baker's Cyst.[26]  However, her examination notes show that, while plaintiff had tenderness in the posterior knee into the hamstring, she walked with a nonantalgic gait, and she had "full active range of motion" with intact distal neurovascular status and "5/5" strength. (*Id.*)  PA Doremus found no instability with varus or valgus stress.[27] (*Id.*)  The ALJ also cited examinations from February 28, 2017 (T. 1084-86); April 4, 2018 (T. 777); April 23, 2018 (T. 897-900); May 16, 2018 (T. 904-908); August 22, 2018 (T. 823-24); and March 8, 2019 (T. 858-59).

The ALJ did not exclude reports in which plaintiff exhibited symptoms of pain and restricted motion, and the ALJ considered positive MRI and X-ray findings[28]

---

[24] The report was also signed by Steven B. Fish, M.D. (T. 772).

[25] As stated above in footnote 23, plaintiff had knee surgery in June of 2018, but the ALJ considered that she recovered well from the surgery.

[26] A Baker's cyst is a fluid-filled cyst that causes a bulge and a feeling of tightness behind the knee. https://www.mayoclinic.org/diseases-conditions/bakers-cyst/symptoms-causes/syc-20369950.  In some cases there is no pain.  However, it may be painful when a person fully flexes or extends the knee or when the individual is active. *Id.*

[27] Varus and valgus stress tests result in the evaluation of the stability of the medial and lateral collateral ligaments of the knee (MCL) (LCL) and are performed by placing force on the joint. https://medical-dictionary.thefreedictionary.com/varus+stress+test, https://medical-dictionary. thefreedictionary.com/valgus+stress+test.

[28] The ALJ cited EMG reports showing mild right ulnar nerve compression and mild to moderate median sensory nerve compression across her right wrist in addition to L5 radiculopathy in her spine. (T. 18) (citing T. 524, 767 (August 2018 EMG)).

showing that plaintiff did have severe impairments which could cause pain.  For example, the February 2017 report, cited above in the ALJ's decision, was authored by PA Heather R. Cayward from Upstate Orthopedics.  The report showed that plaintiff had full range of motion in her shoulders, elbows, wrists, hips, knees, and ankles, notwithstanding a diagnosis of cervical degenerative disc disease; cervical radiculopathy; thoracic degenerative disc disease; and thoracic radiculopathy, with some tenderness to palpation of the upper trapesius muscle and limited flexion and rotation of the cervical spine. (T. 1084).  In addition, PA Cayward performed a motor examination which showed full 5/5 strength in plaintiff's deltoid, biceps, triceps, wrist extensor, wrist flexor, and grip. (T. 1085).

The ALJ considered that plaintiff received regular injections for the arthritis in her thumbs. (T. 17).  On April 25, 2018, PA Doremus reported that, although plaintiff had tenderness to palpation over the carpometacarpal[29] joints, she had "full active range of motion of the hands and fingers," with no obvious deformity, and no erythema[30] or warmth over the area. (T. 780).

The August 22, 2018 report cited above was written by neurologist Abdul Latif, M.D., who stated that plaintiff complained of weakness in her legs after her knee surgery. (T. 823-24).  During the examination, plaintiff told Dr. Latif that she had neck pain, but denied weakness in her arms and numbness in her hands. (T. 823).  Upon

---

[29] The carpometacarpal (CMC) of the thumb is a saddle joint, located at the very base of the thumb, that permits a wide range of motion. https://pubmed.ncbi.nlm.nih.gov/12918864/

[30] Erythema is a superficial abnormal redness of the skin. https://www.merriam-webster.com/dictionary/erythema.

examination, Dr. Latif found mild tenderness[31] in plaintiff's cervical and lumbar spine, normal muscle tone, and no focal motor weakness in the upper or lower extremities. (*Id.*) Plaintiff's gait was normal. (T. 824).

Plaintiff saw Dr. Latif again on March 8, 2019. (T. 858). Plaintiff complained of neck pain. (*Id.*) She complained of pain radiating into her left shoulder muscles and arm. (*Id.*) She told Dr. Latif that her left hand occasionally became numb, but there was no numbness or weakness in her right upper extremity. (*Id.*) She stated that she continued to have back pain, and that she had weakness in both legs, "but [Dr. Latif noted that], despite that she is able to ambulate." (*Id.*) Objectively, Dr. Latif found that plaintiff had moderate tenderness in her cervical spine and lumbar areas, however, plaintiff's motor examination showed no focal weakness in the upper or lower extremities. (*Id.*) Her gait was normal. (T. 858).

On May 1, 2019, plaintiff saw Dr. Veneenenaam, M.D. for her left shoulder and her thumbs. (T. 1190-92). Plaintiff cancelled the surgery she had scheduled for her thumbs because she was getting relief from using CBD oil. (T. 1190). Plaintiff described pain in her left shoulder, radiating down her arm and which hurt with "overhead use," "heavy lifting," or sitting in one position with her shoulder hanging down (*Id.*) Examination of plaintiff's thumbs showed a positive "grind test and localized tenderness," but she had intact reflexes and could "flex and extend her fingers well." (T. 1191). She had pain with resisted abduction of the shoulder and some tenderness at the AC joint of her left shoulder, but "her motion is fairly well preserved

---

[31] On the next page, Dr. Latif found "moderate" tenderness in the cervical spine, shoulder muscles and lumbar area. (T. 824).

as is her strength." (*Id.*)  The ALJ weighed all the evidence in determining that PA Tontarski's MSS was not consistent with, or supported by, the record, and the ALJ's decision to give it no weight was supported by substantial evidence.

Plaintiff argues that the ALJ should not have given greater weight to the Dr. Lorensen and Dr. Seok because they issued their reports in 2017 and did not see the medical evidence that became part of the record after that date. (Pl.'s Br. at 12) (citing Exhibits 15F-58F).  It is true that medical source opinions that are "'conclusory, stale, and based on an incomplete medical record'" may not be substantial evidence to support an ALJ finding. *Paddington v. Comm'r of Soc. Sec.* No. 5:16-CV- 670 (WBC), 2017 WL 3575682, at *5 (W.D.N.Y. Aug. 17, 2017) (quoting *Griffith v. Astrue*, No. 08-CV-6004, 2009 WL 909630, at *9 n. 9 (W.D.N.Y. March 31, 2009)).  However, this does not apply where such opinions are supported by substantially similar findings in treatment notes and other opinions in the record. *Id.* (citing *Camille v. Colvin*, 104 F. Supp. 3d 329, 343-344, (W.D.N.Y. May 19, 2015), *aff'd*, 652 F. App'x 25 (2d Cir. 2016)). *See also Lisa R. v. Comm'r of Soc. Sec.*, No. 20-CV-522 (A), 2021 WL 3052032, at *9 (W.D.N.Y. July 20, 2021) ("a medical opinion is not stale simply based on its age. A more dated opinion may constitute substantial evidence if it is consistent with the record as a whole.").

In this case, it is undisputed that the opinions of both consultative physicians were issued before many of the other medical reports.  However, both consultative physicians were aware of plaintiff's cervical, lumbar, and thumb pain. (T. 74, 638-40). Dr. Lorensen's report contained the handwritten notation next to "Labs and Other

Testing" which reads: "L-Spine" and "Degenerative △." (T. 640).  Dr. Seok reviewed

Dr. Lorensen's opinion and other medical records. (T. 65-66).  In addition to reviewing

the relevant imaging and other diagnostic studies, Dr. Seok stated that he took into

consideration plaintiff's right shoulder rotator cuff tear; osteoarthritis in both thumbs;

disc herniations and other degenerative changes in the cervical, thoracic, and lumbar

spine; obesity; and nerve compression in the right wrist. (T. 74).  Dr. Seok also

considered plaintiff's allegations of limited movement, dexterity, and strength. (T. 72).

As stated above, the subsequent medical reports were consistent with those of the

consultative physicians and consistent with the RFC as established by the ALJ.  While

there were additional X-Rays, MRI tests, and examinations post-dating the consultative

physician's reports, the ALJ considered them in the context of the entire record.  Thus,

the ALJ did not err in the weight he gave the consultative reports because their findings

were consistent with the subsequent medical evidence, and the ALJ considered the

consultative reports in context of the entire record.

Plaintiff then argues that the ALJ committed error when he assessed greater

limitations than either Dr. Seok or Dr. Lorensen, "due to the imaging of the cervical

spine and the EMG of the upper extremities and her testimony regarding difficulty

using her hands." (Pl.'s Br. at 11) (citing T. 19).  Plaintiff claims that by adding

restrictions to the RFC based upon subsequent medical evidence, the ALJ asserted an

opinion "beyond his expertise." (*Id.*)  However, an ALJ's conclusion need not perfectly

correspond with any of the opinions of medical sources cited in his decision as long as

he weighed all of the evidence and made an RFC finding that was consistent with the

record as a whole. *Matta v. Astrue*, 508 F. App'x 53, 56 (2d Cir. 2013).  An RFC finding that is more favorable to the plaintiff than the record may support is not, in itself, cause for remand. *See Tammy Lynn B. v. Comm'r of Soc. Sec.*, 382 F. Supp. 3d 184, 195 (N.D.N.Y. 2019) ("There is nothing improper about an ALJ considering medical opinion evidence that assesses, say, few or no exertional limitations and then relying in part on the combined force of other record evidence, such as a claimant's subjective testimony, to nevertheless choose to assign certain limitations that result in a *more* restrictive RFC finding.") (emphasis in original) (citing *Matta v. Astrue*, 508 F. App'x at 56).

This is exactly what the ALJ did in the instant case.  The ALJ did not interpret any raw medical data. The ALJ began by citing Dr. Seok, who considered the relevant diagnostic studies, and found that no manipulative limitations were warranted. (T. 73-74). The ALJ then adopted the additional limitations, based in part on plaintiff's testimony regarding her limitations. (T. 19) (T. 46-47, 53, 56)).  As discussed above, notwithstanding plaintiff's frequent complaints of weakness, contemporaneous physical examinations did not show that plaintiff's manual dexterity was limited or that plaintiff's upper or lower extremity strength was so limited.  However, there were some positive findings, and plaintiff told the doctors that she had trouble reaching overhead. The ALJ chose to limit the plaintiff to "occasional" overhead reaching and only "frequently" handling, feeling, or fingering. (T. 16).  The ALJ did not commit error in doing so.

While plaintiff asserted more severe restrictions, the ALJ found that plaintiff's

activities were "not limited to the extent one would expect in light of her allegations of disabling medical impairments." (T. 18). Plaintiff argues that the ALJ improperly considered plaintiff's daily activities, did not consider their durational limits, and did not specify what activities were inconsistent with her claimed limitations. (Pl.'s Br. at 12-13). The ALJ may properly consider plaintiff's daily activities and may consider her testimony as well as statements that she made to physicians, or statements she made at previous administrative steps in her application. SSR 16-3p, 2017 WL 5180304, at *8 ("[W]e will compare statements an individual makes in connection with the individual's claim for disability benefits with any existing statements the individual made under other circumstances."). *See also Del Carmen Fernandez v. Berryhill*, No. 18-CV-326, 2019 WL 667743, at *9 (ALJ must carefully consider multiple factors, including daily activities).

The ALJ must provide specific reasons for the determination. *Cichocki v. Astrue*, 534 F. App'x at 76. However, the failure to specifically reference a particular relevant factor does not undermine the ALJ's assessment as long as there is substantial evidence supporting the determination. *Id. See also Del Carmen Fernandez v. Berryhill*, 2019 WL 667743 at *11 (citing *Rousey v. Comm'r of Soc. Sec.*, 285 F. Supp. 3d 723, 744 (S.D.N.Y. 2018)). "[R]emand is not required where 'the evidence of record allows the court to glean the rationale of an ALJ's decision.'" *Cichocki v. Astrue*, 534 F. App'x at 76 (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983)).

In this case, the ALJ found that plaintiff's impairments could reasonably cause pain and other symptoms, but not to the extent alleged by plaintiff. The ALJ stated that

plaintiff's description of her daily activities to her health care providers was inconsistent with her testimony that she could not perform many activities and that her husband had to help her to complete them.  The ALJ also recognized that the "the claimant's ability to engage in these ordinary daily activities is not itself conclusive proof that the claimant is also able to engage in substantial gainful activity . . . ." (T. 18).  Instead, "her capacity to perform these tasks independently is a strong indication that the claimant retains the capacity to perform the requisite physical and mental tasks that are part of everyday basic work activity," and this finding was supported by the medical signs and findings discussed elsewhere in the ALJ's opinion. (T. 18-19).

Plaintiff testified that her husband did all the cooking, cleaning, shopping, and yard work. (T. 54).  However, she told Dr. Lorensen that she performed these household duties regularly, albeit not every day. (T. 639).  She stated that, while doing chores, she had to work slowly and rest, but did not mention that she needed her husband's help to complete these tasks. (T. 646-47).  Plaintiff stated that she spent her days "doing chores, resting, keeping appointments, and using a computer.[32] (T. 647).  On September 26, 2018, plaintiff told Dr. Latif that she fell backwards while "mowing her lawn." (T. 825).  This activity is inconsistent with plaintiff's testimony that her husband did all of the outside maintenance and her claims (and PA Tontarski's

---

[32] While plaintiff testified to severe restrictions at her hearing, she also stated that she spent ten to fifteen hours per week at her computer store, making appointments and talking to customers, after which she would go to her medical appointments. (T. 55).  She also testified that her hands were bothering her because she had done "a lot of keyboard inputting" for her son the day before the hearing, and she was "paying for it." (T. 56).

37

statements) of inability to grip, lack of manual dexterity, and lack of strength.[33]

Although plaintiff consistently complained of pain to her chiropractor, Donell Wright, DO, on October 30, 2017,[34] she told him that her pain was worse because "she did clean a house yesterday and was up and down a step ladder a few times and *bending a lot*." (T. 1136) (emphasis added).  On July 23, 2018, she told Dr. Donell that she was feeling worse because she had "cleaned a house out" the day before, and she engaged in "a lot of repetitive motion." (T. 1153).  On August 20, 2018, while claiming a variety of functional limitations, she reported pain in her neck, "after a lot of cleaning over the weekend." (T. 1155).  On November 12, 2018, plaintiff told Dr. Donell that her hip "went out" after she took care of her granddaughter for a week and lifted her. (T. 1161). On February 11, 2019, plaintiff told Dr. Donell that she had been helping to stage a home and *moving furniture* in the dark. (T. 1167) (emphasis added).  She was using a flashlight and dropped it on her big toe. (*Id.*)  On March 25, 2019, plaintiff told Dr. Donell that her low back pain was worse from "cleaning house *all day yesterday*." (T. 1169) (emphasis added).  On April 29, 2019, plaintiff told Dr. Donell that she had been "cleaning all day" the previous day, and "after all the bending over and kneeling down," she had a hard time sleeping due to low back pain. (T. 1171).

Plaintiff argues that these activities do not show that plaintiff is able to work

---

[33] During his examination, Dr. Latif found that plaintiff had no focal motor weakness in her upper or lower extremities, notwithstanding moderate tenderness in her cervical spine, shoulder muscles, and lumbar area. (T. 825).  Plaintiff's gait was "normal." (*Id.*)

[34] She told Dr. Donell that the pain was exacerbated by sitting, standing, household chores, walking, bending, lifting, twisting, driving, reaching, sleeping, movement, and exercise. (*See e.g.* T. 1132, 1134, 1136).

consistently for an entire work week.  However, as defendant argues, the ALJ considered this and determined that her activities, together with the medical evidence of record supported his conclusion that she could work full-time at her previous work as it was generally performed. Although the ALJ did not specify each activity cited above as inconsistent with plaintiff's allegations, substantial evidence in the record supports the ALJ's consistency finding.

Plaintiff's second argument is that the ALJ's RFC is incorrect because of the errors outlined in her first argument.  Plaintiff essentially argues that "if" PA Tontarski's and Dr. Lorensen's opinions were properly considered, then plaintiff would be unable to stand on her feet or sit for prolonged periods and would be unable to perform more than "occasional" handling, fingering, or feeling.[35] (Pl.'s Br. at 16-17). Plaintiff claims that, assuming the proper analysis, the VE testified that there was no work that plaintiff could perform, either in the light or sedentary categories. (*Id.*)  This court has found no reversable error in the ALJ's analysis of the medical evidence, including his decision to give no weight to PA Tontarski's MSS, in the ALJ's

---

[35] Plaintiff states that if all of Dr. Lorensen's "observations" regarding her thumbs, neck, and shoulder were to be "properly considered," it is "clear that the Plaintiff is limited to 'occasional handling, fingering and feeling at the most," which according to the VE would prevent plaintiff from performing any substantial gainful activity. (Pl.'s Br. at 16-17).  However, it is unclear to what plaintiff is referring.  In the MSS section of his consultative opinion, Dr. Lorensen specifically found that plaintiff's "hand and finger dexterity [were] intact," and that her grip strength was "5/5 bilaterally." (T. 640).  While he did find six positive trigger points for fibromyalgia, he also concluded that plaintiff had "no gross limitations to sitting, standing, walking or handling small objects with the hands." (T. 641). He concluded that plaintiff had mild to moderate limitations in bending, lifting, reaching, and turning her head. (*Id.*)  Plaintiff may be citing to the portion of Dr. Lorensen's report, entitled "Chief Complaint," in which he articulates plaintiff's subjective description of her limitations because that is the only place in which Dr. Lorensen comments specifically about her thumbs, her fibromyalgia, and other more substantial restrictions. (T. 638). However, that section of his report is followed by his actual physical examination (T. 639-40), which formed the basis for his MSS appearing at (T. 641).

consistency determination, and in his RFC determination.  Thus, plaintiff's second argument is not persuasive.

WHEREFORE, based on the findings above, it is

ORDERED, that the decision of the Commissioner is **AFFIRMED**, and plaintiff's complaint is **DISMISSED**, and it is

ORDERED, that the Clerk enter judgment for the **DEFENDANT**.

Dated: March 17, 2022

Andrew T. Baxter
U.S. Magistrate Judge